UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| HEFTER IMPACT | ) | CIVIL ACTION NO. |
| TECHNOLOGIES, LLC | ) | |
|     Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| SPORT MASKA, INC., | ) | |
| d/b/a REEBOK-CCM HOCKEY | ) | |
|     Defendant. | ) | |

## **COMPLAINT**

Hefter Impact Technologies, LLC (hereinafter "**Plaintiff**" or "**HIT**") through its undersigned counsel, and as its initial Complaint against Defendant Sport Maska, Inc. d/b/a Reebok-CCM Hockey ("**Reebok-CCM**"), states, alleges, and avers as follows:

## **NATURE OF THE ACTION**

1.     This case concerns Defendant's breach of its ongoing obligations to HIT to pay royalties owed on the sales of certain products incorporating HIT's hockey helmet shell design, or any design derived from and substantially similar to that design, pursuant to the Parties' Purchase and Assignment Agreement (the "**Contract**") entered into in 2005.

2.     Specifically, this is an action against Defendant for declaratory relief under the Federal Declaratory Judgment Act 28 U.S.C. § 2201 seeking a declaration that the CCM Resistance Helmet[1] (the "**Resistance Helmet**") fits the definition of "Product" within the meaning

---

[1] The CCM Resistance Helmet, as that term is used herein, encompasses the entire Resistance helmet line, which currently includes the Resistance, the RES 300 and RES 100 models, as well as future products developed and/or released by Defendant incorporating that same helmet shell design.

of the Contract. This action for declaratory judgment is brought to resolve an actual and justiciable controversy between the Parties, as Defendant disputes that the Resistance Helmet falls within the Contract's definition of "Product" and has refused to account to and pay HIT its contractually owed royalty on profits derived from sales of the Resistance Helmet.

3.      This is also an action for breach of contract against Defendant, arising from Defendant's failure to adhere to the terms of the Contract and account for and pay to HIT royalties on sales of the Resistance Helmet, in accordance with the terms of the Contract. This is further an action against Defendant for unjust enrichment and breach of the duty of good faith and fair dealing, arising from Defendant's knowing and continued sales of a hockey helmet that falls within the definition of "Product" under the Contract while refusing to account for or pay HIT any royalties thereon, which rightfully belong to HIT.

4.      Finally, HIT seeks a proper and accurate accounting of Defendant's net sales of the Resistance Helmet and the CCM Vector Helmet[2] (the "**Vector Helmet**") since the initial release of those products, and the monies rightfully owed to HIT under the Contract as royalties on those net sales.

## PARTIES

### Plaintiff Hefter Impact Technologies, LLC

5.      Hefter Impact Technologies, LLC ("**HIT**") is a limited liability company duly formed and existing under the laws of the State of Colorado.

---

[2] The CCM Vector Helmet, as that term is used herein, encompasses the entire Vector Helmet line, including, upon information and belief, the V10, V08, V06, and V04 models.

6.     HIT operates out of Colorado and has a principal place of business located at 8551 Strawberry Lane, Niwot, Colorado 80503.

7.     Dennis Hefter ("**Hefter**") is an individual, and a member and founder of HIT. He is a citizen of Colorado, and resides at 8551 Strawberry Lane, Niwot, Colorado 80503.

**Defendant Sport Maska, Inc. d/b/a Reebok-CCM Hockey**

8.      Upon information and belief, Sport Maska, Inc. d/b/a Reebok-CCM Hockey ("**Reebok-CCM**") is a Canadian corporation, headquartered in Montreal, Canada with a principal place of business at 3400 Raymond-Lasnier St., Saint-Laurent, Quebec H4R 3L3.

### JURISDICTION AND VENUE

9.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(1), in that the Parties are citizens of different States and because the amount in controversy exceeds $75,000.00, exclusive of interest and costs. Specifically, this action is between Plaintiff HIT, a Colorado limited liability company, and Defendant, a Canadian corporation. The exercise of supplemental jurisdiction under 28 U.S.C. § 1367(a) is consistent with the jurisdictional requirements of 28 U.S.C. § 1332, in accordance with 28 U.S.C. § 1367(b). In addition, an actual and justiciable controversy exists between the Parties, making a declaratory judgment action proper under 28 U.S.C. §§ 2201–2202.

10.     Personal jurisdiction over Defendant is proper in this Court on the grounds that (a) Defendant transacts substantial business in the State of Massachusetts; and (b) the Parties hereto entered into an agreement under the Contract which requires all claims arising under the Contract to be brought in the federal courts in Boston, Massachusetts.

11.     Venue is proper in this Court pursuant to 28 U.S.C. §§ 1391(b)(3) because Defendant is subject to this Court's personal jurisdiction for the reasons discussed above, and pursuant to the Contract, which provides that HIT and Defendant consent to exclusive jurisdiction of and venue in the federal courts in Boston, Massachusetts.

## GENERAL ALLEGATIONS

*Creation of HIT and Development of the Hefter Evolution Design*

12.     In or about 2003 Hefter began work on development of a new and revolutionary hockey helmet design.

13.     Upon information and belief, all hockey helmets on the market at that time were remarkably similar and incorporated shells that were rounded-off in the rear and followed the contours of the head. For example, helmets being sold by four leading hockey helmet manufacturers in the early 2000s, the Itech HC 100, the Bauer 4500, the Mission Carbster, and the CCM HT852 all possessed this same general shape and common aesthetic. Images of these helmets are attached hereto as **Exhibit A**.

14.     This common and similar design and overall look of hockey helmet shells was largely the same as the design and overall look of helmets that dominated the market for decades prior. In fact, the CCM HT852, which was available in 2003, featured the same general shape and design elements seen in the CCM helmets worn by the United States Olympics men's hockey team in 1980. A side-by-side comparison of these CCM helmets is attached hereto as **Exhibit B**.

15.     Hefter hired neurologist James Kelly and designer David Rogers who was working for and owned Artisent, Inc. to assist in designing, developing, and testing the safety of the new hockey helmet.

16.    Hefter's primary concerns in developing the new helmet were creation of a hockey helmet that was attractive looking to players, safe, and utilized a unique and distinctive design that was distinguishable from other hockey helmets on the market and could be readily seen on the rink.

17.    Another common goal of Hefter and designer David Rogers was to create a helmet that was sleek and narrow on the sides, with a high, angular rear that utilized sharp, squared-off angles as opposed to the rounded design that dominated the market throughout the early 2000s.

18.    As part of Hefter's efforts, Plaintiff HIT was formed as a privately-funded, start-up venture in or about May of 2004.

19.    HIT developed and completed a final helmet design in 2004, branded as the "Hefter Evolution Helmet," which incorporated the Hefter Evolution Design as its outer shell.

20.    The Hefter Evolution Helmet was debuted to the public at hockey trade shows in Toronto, Canada and Las Vegas, Nevada in early 2005.

21.    During these trade shows, the Hefter Evolution Helmet garnered significant interest from consumers and representatives of hockey outfitters, including Defendant.

22.    Major hockey outfitters, including but not limited to Defendant, expressed interest in buying HIT's operation and rights to the Hefter Evolution Helmet. As a result, HIT began negotiations which ultimately led to its sale and assignment of the Hefter Evolution Design to Defendant.

*The 2005 Contract*

23.    On or about November 15, 2005, HIT and Defendant entered into the Contract.

24.     As reflected in the Background provisions of the Contract and as discussed above, HIT had developed designs for the shell of a hockey helmet, and Defendant was "in accordance with the terms contained [in the Contract], interested in purchasing [HIT's] right, title, and interest to the designs [] in order to further develop and possibly market such designs."

25.     HIT's hockey helmet shell design, the "Hefter Evolution Design," which was debuted in early 2005 at the Toronto and Las Vegas trade shows, was made the subject of the Contract and Defendant was provided the concept sketches and prototype of that design.

26.     Under the terms of the Contract, Defendant agreed to pay HIT a lump sum of $350,000 and make continuing royalty payments to HIT to the extent that Defendant sold any Product, in exchange for the HIT's agreement to irrevocably sell, assign, transfer, and convey to Defendant HIT's rights, title, and interest in and to the Hefter Evolution Design. The assignment and royalty provisions of the Contract explicitly provide that:

> 3.1   <u>Assignment of Shell Design</u> [HIT] hereby irrevocably sells, assigns, transfers and conveys exclusively to [Defendant], throughout the world and in perpetuity, [Defendant's] entire right, title and interest in the Shell Design, including, but not limited to, all rights to apply in any or all countries of the world for patents, certificates of inventions or other governmental grants on said Shell Design, including the right to apply for and obtain patents pursuant to any other convention, treaty, agreement or understanding, and all Intellectual Property Rights in and to the Shell Design. All such rights, title and interest to be held and enjoyed by [Defendant], its successors, legal representatives and assigns to the same extent as all such rights, title and interest would have been held and enjoyed by [HIT] had this assignment and sale not occurred.

> [. . . .]

> 3.5   <u>Payments</u>

> [. . . .]

> (b) In further consideration of the assignments set forth above, [Defendant] shall, beginning on the Effective Date and to the extent that [Defendant] sells (i) any

6

Product that incorporates the Shell Design, pay to [HIT] a continuing payment of 4.5% of all Net Sales of all such Products . . . . Payments for ongoing sales shall be paid quarterly, within thirty (30) days following the end of a quarter. If [Defendant] fails to make any payment stipulated in this [Contract] within the time specified herein, [Defendant] shall pay an interest of eight percent (8%) per year on the unpaid balance payable from the due date until fully paid.

27.     Relevantly, the Contract defines the term "Product" to include a hockey helmet that

incorporates the "Shell Design," which is defined pursuant to the Contract as:

the design shown in Exhibit A [t]hereto [(the Hefter Evolution Design)], including the ornamental design and technical features of the design, or any shell derived therefrom and substantially similar thereto. The Shell Design does not include the foam liner of the helmet, nor does it include any helmet whose ornamental design and technical features would not come within the scope of an issued U.S. industrial design, if a U.S. industrial design protecting the Shell Design were to be in existence.

28.     Defendant's obligation to make continuing royalty payments remains in effect for

fifteen (15) years after the first sale to the third party of any Product incorporating the Shell Design,

as those terms are defined in the Contract.

29.     Further, Defendant also agreed to account for and provide to Plaintiff a written

accounting by model of any Products incorporating the Shell Design, and the amount of royalties

due thereon with each ongoing royalty payment. Specifically, the Contract expressly obligates

Defendant to do the following:

[Defendant] shall forward to [HIT] with each ongoing payment a written accounting by model of the number of Products incorporating the Shell Design . . . and the amount due thereon. [Defendant] and its licensees shall keep true and accurate books of account with respect to the distribution and sales of such Products. [HIT] will have the right upon thirty (30) days prior written notice to [Defendant] or its licensees, to inspect such books of account at [Defendant] or its licensee's principal place of business during normal business hours, for the sole purpose of confirming the calculation of payments made hereunder. As part of such review, [HIT] may, at its own expense, conduct an audit of such books, provided that such audit may not be conducted more than once during any calendar year. If any such audit discloses a shortfall in reporting or payments, [Defendant] will immediately remit such shortfall

to [HIT]. If any such audit discloses a shortfall in reporting or payments of more than five percent (5%) of the total amount due in the preceding calendar year, [Defendant] will reimburse [HIT] for the reasonable out-of-pocket costs of the audit.

*Development, Release, and Market Opinions of the CCM Vector and Resistance Helmets*

30.     The Hefter Evolution Design utilizes a high, squared-off shape in the rear as well as ventilation holes strategically placed on the front, sides, and rear of the helmet.

31.     Following the purchase and assignment of the Hefter Evolution Design pursuant to the Contract, Defendant developed the Vector Helmet. As indicated above, upon information and belief, the Vector Helmet includes four different helmet models – the V10, the V08, the V06, and the V04.

32.     Upon information and belief, subsequent to its release, the Vector Helmet shell was touted by Reebok-CCM and others as the most popular hockey helmet shell in the National Hockey League.

33.     The outer shells of each of the four models that were part of the Vector Helmet line incorporated some, but not all, of the key design elements of the Hefter Evolution Design.

34.     Specifically, the V10 and the V08, images of which are attached hereto as **Exhibit C**, utilized the same outer shell design, which incorporated the high, squared-off shape in the rear of the helmet, the same placement and number of ventilation holes on the side of the helmet at the rear, and the same vertical placement of ventilation holes at the rear of the helmet that were featured as part of the Hefter Evolution Design. The V10 and V08 helmet shells did not, however, incorporate the same number of vertical ventilation holes at the rear of the helmet, did not feature the same layout or number of ventilation holes in the front of the helmet or on the sides of the helmet at the front, and also featured a different layout of the external shell around the ears.

8

35.     The V06 and the V04, images of which are attached as **Exhibit D**, utilized the same outer shell design, which differed from that of the V10 and the V08 models, incorporated the same high, squared-off shape in the rear of the helmet, and the same placement of ventilation holes at the rear of the helmet that were featured as part of the Hefter Evolution Design. The V06 and V04 models also incorporated a similar look on the sides of the helmet, with some minor differences, but failed to include the same number of vertical ventilation holes at the rear, the same tool-less adjustment mechanism on the side of the helmet, any ventilation holes on the sides of the helmet at the rear, and also featured a different layout and placement of the ventilation holes on the front and on the sides at the front of the helmet, as well as a different layout of the external shell around the ears.

36.     Since the release of the Vector Helmet in 2007, Defendant has continuously paid Plaintiff royalties on the net sales of all four models in accordance with the Contract, and has never disputed Plaintiff's entitlement to payment of royalties thereunder or that each model in the Vector Helmet line falls within the definition of "Product" under the Contract by incorporating the Shell Design.

37.     Royalties paid to HIT by Defendant to date on sales of the Vector Helmet exceed $1,419,500.00.

38.     Upon information and belief, several years into the Contract, Defendant began developing a new hockey helmet by starting off with the key, popular features and design elements of the Vector Helmet line and ultimately produced the Resistance Helmet, which maintained the classic CCM DNA look, substantially similar to the Vector Helmet line and the Hefter Evolution

Design with the same high, squared-off shape in the rear and substantially similar placement of ventilation holes and overall aesthetic.

39.     Upon information and belief, the high, squared-off shape in the rear of the helmet as well as the substantially similar overall aesthetic and placement of side, rear, and front ventilation holes featured in the Hefter Evolution Design and maintained in the Vector Helmet were incorporated into the shell design of the Resistance Helmet as the product of these efforts. Images showing a comparison of the Resistance Helmet, the Vector Helmet (specifically the V08 model), and the Hefter Evolution Helmet is attached hereto as **Exhibit E**, and shows the virtually identical design features and overall aesthetic utilized in each of the three helmet shells.

40.     Defendant's own designer, Philippe Martin, stated in a YouTube video that he started the design of the Resistance Helmet by using feedback from consumers about what those consumers liked about the previous CCM helmet (which is the Vector Helmet) and not deviating too far from that look and key design elements that consumers liked in developing the new product.

41.     Further, one of Defendant's product managers, Charles Benoit, explained in a review of the Resistance Helmet that the Resistance Helmet maintains "the classic CCM DNA look, approved by our NHL endorsees to make sure it passed the mirror test."

42.     Upon information and belief, these references to previous CCM helmets and the "classic CCM DNA" look refer to the Vector Helmet, as it was the primary and best-selling helmet offered by Defendant prior to the Resistance Helmet's release, and because all helmets prior to the Vector Helmet's release possessed a drastically different appearance, incorporating outer shells that were rounded, as opposed to angular, and that lacked many of the ventilation holes strategically placed on the Vector Helmet, and maintained in the Resistance Helmet.

43.    Based on the representations made by Defendant's representatives, it is virtually undisputed that the Resistance Helmet is "derived from and substantially similar" to the Hefter Evolution Design, and thus a Product under the terms of the Contract.

44.    Upon information and belief, the Resistance Helmet was introduced to the market and began being sold in or around June of 2014.

45.    Upon information and belief, since its release, consumer, player, and/or retailer reviews have touted that the Resistance Helmet is an evolution of the longstanding Vector Helmet line and possesses a similar look, that the outer shell of the Resistance Helmet resembles the Vector Helmet line, and that the shell shape of the Resistance Helmet is an evolution of the Vector Helmet and thus has done well being adopted and accepted by members of the National Hockey League.

46.    As a result of the striking similarities in the Resistance Helmet and the Vector Helmet lines and as evidenced by consumer, retailer, and player reviews following the Resistance Helmet's release, a consumer could easily confuse the two and/or conclude that the Resistance Helmet incorporates a design that is derived from and based on the Vector Helmet, which falls squarely within and has been interpreted by the parties for years to fit the definition of "Product" under the Contract.

_Defendant's Failure to Perform Following Release of the Resistance Helmet_

47.    Since Defendant's release of the Resistance Helmet, Defendant has not delivered and HIT has not received any royalties on or any accounting of net sales of the Resistance Helmet.

48.    In an effort to diligently enforce its rights under the Contract, HIT contacted representatives of Defendant regarding nonpayment of royalties once such nonpayment was

discovered and demanded that royalties be paid to HIT on net sales of the Resistance Helmet under the terms of the Contract.

49.     Despite this demand, Defendant refused to properly account to and pay HIT for any sales of the Resistance Helmet under the royalty terms of the Contract, asserting that the Resistance Helmet did not fall within the contractual definition of "Product."

50.     Further, HIT and Defendant submitted their dispute over the propriety of royalties on the Resistance Helmet to mediation in accordance with the dispute resolution clause of the Contract in or about April of 2015.

## FIRST CLAIM FOR RELIEF
### (Declaratory Judgment)

51.     Plaintiff realleges and incorporates all allegations set forth previously or below as though fully set forth herein.

52.     Pursuant to 28 U.S.C. § 2201, this Court may declare the rights and other legal relations of any interested party seeking such declaration whether or not further relief is, or could be, sought. Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such.

53.     As explained above, an actual and justiciable controversy exists between Plaintiff and Defendant with respect to their rights and obligations under the provisions of the Contract, and specifically whether the Resistance Helmet falls within the contractual definition of the term "Product," thus obligating Defendant to make continuing royalty payments to Plaintiff on Defendant's net sales thereof.

54.     Plaintiff accordingly seeks a declaration that the Resistance Helmet is a "Product" within the meaning of the Contract, thus obligating Defendant to pay the Plaintiff a 4.5% royalty on net sales of the Resistance Helmet.

55.     Absent the declaratory relief requested from this Court, Plaintiff faces the imminent risk of continuing to be denied payment of royalties rightfully owed under the Contract, as Defendant continues to sell or distribute the Resistance Helmet while unilaterally asserting that no royalties are owed to Plaintiff thereon.

56.     By reason of the foregoing, there is a present controversy between Plaintiff and Defendant for which declaratory judgment should be entered.

## SECOND CLAIM FOR RELIEF
### (Breach of Contract)

57.     Plaintiff realleges and incorporates all allegations set forth previously or below as though fully set forth herein.

58.     As described above, Plaintiff and Defendant, for good and valuable consideration, entered into a written contractual agreement, the Contract, upon agreed material terms, by which Plaintiff sold, assigned, transferred, and conveyed the entirety of its rights, title, and interest in and to the Hefter Evolution Design, and/or any design derived from and substantially similar to the Hefter Evolution Design, in exchange for Defendant's payment of a lump sum of $350,000 and a continuing royalty obligation of 4.5% of Defendant's net sales of any Product sold for a period of fifteen (15) years.

59.     Pursuant to the Contract, Plaintiff and Defendant further agreed that Defendant would provide a written accounting by model number of all Products sold and the amounts due thereon to Plaintiffs with each ongoing payment.

60.     The Contract explicitly provides that Defendant shall "pay to [HIT] a continuing payment of 4.5% of all Net Sales of" any Product "that incorporates the Shell Design" as consideration for the Plaintiff's assignment of that design. Further, the Contract states that with each ongoing payment Defendant shall forward to Plaintiff "a written accounting by model of the number of Products incorporating the Shell Design . . . and the amount due thereon."

61.     As particularly stated in the foregoing general allegations, the Resistance Helmet is a Product under the Contract because it incorporates an outer shell design that was based on and is substantially similar to the Hefter Evolution Design.

62.     Plaintiff has demanded that Defendant honor its ongoing royalty obligation under the Contract by paying Plaintiff royalties on sales of the Resistance Helmet in accordance with the terms of the Contract.

63.     Defendant materially breached and failed to perform, and continues to breach and fail to perform, under the Contract by failing to pay Plaintiff royalties, as required and in accordance with the Contract's terms, on net sales of the Resistance Helmet.

64.     Defendant further breached and failed to perform under the Contract by failing to account for and provide to Plaintiff a written accounting of the number of Resistance Helmets sold and the amounts owed to Plaintiff thereon as a royalty.

65.     As a direct and proximate result of Defendant's breaches, Plaintiff has incurred and continues to incur actual damages, in an amount to be proven at trial.

66.     The Contract further provides that in the event that Defendant breaches any of its obligations under the Contract, it "shall defend, indemnify and hold [HIT] . . . harmless from and against any and all claims, suits, judgments, demands, liabilities, costs and expenses (including

reasonable attorneys fees) [] arising out of or in connection with" that breach. Plaintiff further seeks recovery of attorneys' fees and costs in addition to all other damages for this breach of contract.

67.     Plaintiff is not terminating or rescinding the Contract, but rather sues to recover the losses suffered from Defendant's breach as well as amounts Plaintiff is contractually entitled to on expected net sales of the Resistance Helmet moving forward throughout the remaining term of the Contract.

## THIRD CLAIM FOR RELIEF
### (Breach of the Duty of Good Faith and Fair Dealing)

68.     Plaintiff realleges and incorporates all allegations set forth previously or below as though fully set forth herein.

69.     Plaintiff and Defendant have a valid and enforceable contract, the 2005 Purchase and Assignment Agreement. As the legal and beneficial owner of rights under the Contract, specifically the rights to receive ongoing royalty payments on the net sales of Products by Defendant, Plaintiff has the right to bring this action.

70.     The Contract contained an implied duty on the part of Defendant to act in good faith and deal fairly with Plaintiff.

71.     The Contract obligates Defendant to pay Plaintiff a 4.5% royalty on the ongoing net sales of all Products incorporating the Hefter Evolution Design, or any design derived from and substantially similar to that design.

72.     As particularly stated in the foregoing general allegations, Defendant failed and continues to fail to pay any royalties to Plaintiff for sales of the Resistance Helmet and attempts to

justify this breach by unilaterally asserting that the Resistance Helmet does not fit the definition of "Product" under the Contract, despite clear evidence to the contrary.

73.     Defendant, by and through its conduct and actions described in this Complaint, and by other acts not presently known by Plaintiff, breached the implied covenant of good faith and fair dealing and unfairly interfered with the Plaintiff's right to receive the benefits of the Contract, namely royalties on sales of the Resistance Helmet.

74.     Plaintiff has fully performed all of its obligations under the Contract.

75.     Defendant's interference with Plaintiff's right to receive the benefits of the Contract is the legal cause of substantial damage to Plaintiff for which Plaintiff seeks monetary damages in an amount to be determined at the time of trial.

## FOURTH CLAIM FOR RELIEF
(Unjust Enrichment)

76.     Plaintiff realleges and incorporates all allegations set forth previously or below as though fully set forth herein.

77.     By irrevocably selling, assigning, transferring, and conveying the entirety of its right, title, and interest in and to the Hefter Evolution Design, or any design falling within the definition of "Shell Design" under the Contract, to Defendant, Plaintiff conferred a benefit on the Defendant, including but not limited to the ability to utilize that design in developing, marketing, and selling future products such as the Resistance Helmet.

78.     Defendant appreciated the benefit by utilizing and incorporating the key features of the Hefter Evolution Design in developing, marketing, and selling the Resistance Helmet.

79.     Defendant failed, and continues to fail, to pay Hefter any royalties whatsoever on sales of the Resistance Helmet but has retained the benefits conferred by Plaintiff by utilizing

Plaintiff's design in developing, marketing, selling, and continuing to sell the Resistance Helmet and retaining the proceeds of the net sales thereof. Consequently, Defendant has been unjustly enriched to the detriment of the Plaintiff.

80.     Because Defendant has not paid for the benefit received by Plaintiff as explained above, it would be inequitable for Defendant to retain that benefit without providing payment therefore, in the form of royalties on the net sales of the Resistance Helmet as previously agreed upon by the parties.

81.     Defendant has been unjustly enriched and Plaintiff has been damaged, in an amount to be proven at trial, by the actions and inaction of Defendant in failing to account for and pay royalties to Plaintiff on net sales of the Resistance Helmet.

## FIFTH CLAIM FOR RELIEF
(Accounting)

82.     Plaintiff realleges and incorporates all allegations set forth previously or below as though fully set forth herein.

83.     Under the terms of the Contract, Defendant is obligated to provide Plaintiff with a written accounting by model of the number of Products incorporating the Shell Design and the amount due thereon.

84.     From the date the first sale of a Resistance Helmet was made by Defendant, Defendant has failed to pay Plaintiff any royalties on the Resistance Helmet under the terms of the Contract, no statement of account has been rendered, and no accounting has been had with respect to royalties rightfully owed to Plaintiff on those sales.

85.     Plaintiff, due to the wrongful acts of Defendant in failing to pay royalties on the Resistance Helmet under the Contract, is entitled to a full accounting by Defendant of amounts

relating to such sales, whereby Plaintiff may determine the amounts rightfully belonging to them and wrongfully gained by Defendant.

86.     Plaintiff is further contractually entitled to a full accounting by Defendant of amounts relating to sales of the Vector Helmet, whereby Plaintiff may determine the amounts rightfully belonging to them pursuant to the royalty terms in the Contract.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, Hefter Impact Technologies, LLC, respectfully requests that this Court award it relief as follows:

(A)     Judgment in favor of Plaintiff and against Defendant on all claims;

(B)     An order declaring that the Resistance Helmet falls within the definition of "Product" under the Contract as prayed for above;

(C)     An order requiring Defendant to submit to an accounting so that all gains, sales, profits, and advantages derived by Defendant on sales of the Resistance Helmet and the Vector Helmet may be determined;

(D)     An award of Plaintiff's actual damages, in amounts to be proven at trial;

(E)     An award of pre-judgment and post-judgment interest on any award of damages at the maximum rate permitted by law;

(F)     An award of actual and reasonable attorneys' fees and costs for services incurred in pursuing and prosecuting this action as provided for under the terms of the Contract; and

(G)     Such other and further relief as this Court deems just and equitable.

RESPECTFULLY submitted this 3rd day of September, 2015.

Plaintiff,

Hefter Impact Technologies, LLC,

By its undersigned attorney,


*/s/ GILES L. KRILL*

_____

Giles L. Krill, Massachusetts BBO # 647528
Law Offices of Edward A. Gottlieb
309 Washington Street, Brighton, MA 02135
Tel: (617) 789-5678
Fax: (617) 789-4788
giles@gottliebesq.com