UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| HEFTER IMPACT TECHNOLOGIES, LLC, ) <br> ) <br> Plaintiff, ) <br> ) <br> v. ) <br> ) <br> SPORT MASKA, INC., d/b/a REEBOK – CCM ) <br> HOCKEY, ) <br> ) <br> Defendant. ) | Civil Action No. <br> 15-13290-FDS |

**MEMORANDUM AND ORDER ON PLAINTIFF'S MOTION FOR SANCTIONS
FOR SPOLIATION OF EVIDENCE AND DISCOVERY MISCONDUCT**

**SAYLOR, J.**

This is a contract dispute. In 2005, plaintiff Hefter Impact Technologies, LLC, ("HIT") entered into an agreement with defendant Sport Maska, Inc., d/b/a Reebok – CCM Hockey, for the sale and assignment of a design for an ice-hockey helmet. The agreement provided for a lump-sum payment as well as the payment of royalties on the sale of certain helmets. In substance, the complaint alleges that defendant has failed to pay HIT royalties it is owed under the agreement.

HIT has filed a motion for sanctions for spoliation of evidence. For the following reasons, the motion will be granted in part and denied in part.

**I.    Background**

    **A.    Factual Background**

Unless otherwise noted, the following facts are undisputed.

1. **Parties**

Hefter Impact Technologies, LLC is a limited liability company that designs ice-hockey helmets. (Def. Mot. Summ. J. SMF ¶ 1). Defendant Sport Maska, Inc. is a corporation doing business as Reebok – CCM Hockey ("CCM") and headquartered in Montreal, Canada. (Answer ¶ 8). CCM sells ice-hockey equipment, including helmets. (Pl. Mot. Summ. J. SMF ¶ 1).

Around 2003, HIT developed a new design for an ice-hockey helmet that the parties call the "Hefter Shell Design." (*Id.* ¶ 1).[1] Dennis Hefter, the founder of HIT, testified that he created the Hefter Shell Design to appear more narrow and angular than existing helmets in order to give it a "faster" look. (Hefter Dep. 106; Pl. Mot. Summ. J. SMF ¶ 2).

2. **Purchase and Assignment Agreement**

On November 15, 2005, CCM and HIT entered into a Purchase and Assignment Agreement under which HIT conveyed the right, title, and interest in the Hefter Shell Design to CCM. (Def. Mot. Summ. J. SMF Ex. 2, Purchase and Assignment Agreement (the "Agreement")). The Agreement provided for a lump-sum payment of $350,000 for the assignment of the Hefter Shell Design and for royalties of 4.5% of all net sales of "any Product that incorporates the Shell Design." (*Id.* § 3.5). As relevant here, "Product" is defined under the Agreement to mean "a hockey helmet that incorporates the Shell Design." (*Id.* § 2.14). "Shell Design," in turn, is defined to mean "the design shown in [a schematic attached to the Agreement], including the ornamental design and technical features of the design, or any shell derived therefrom and substantially similar thereto." (*Id.* § 2.15).

---

[1] "Shell" is a term in common use that refers generally to the hard outer layer that is visible when a helmet is worn. Although the Agreement uses the term "Shell Design" to refer to the design at issue here, the Court, following the parties' lead, uses the term "Hefter Shell Design" to avoid confusion.

2

### a. Helmets Not in Dispute

After signing the Agreement, CCM developed a new line of hockey helmets called "Vector" based, in part, on the Hefter Shell Design. (Def. Mot. Summ. J. SMF ¶ 5). The line encompassed multiple helmet models with different shell designs. (Martin Dep. 134–35). A CCM employee named Phillipe Martin was responsible designing the Vector line. (*Id.* at 91–92). Martin testified that for one set of Vector models, about 30% of the design was based on the Hefter Shell Design. (*Id.* at 135). For another set of Vector models, less than about 50% was based on the Hefter Design. (*Id.* at 134).

CCM viewed the Vector line as a success. (Gibson Dep. 121). By 2012, about a third of National Hockey League players were wearing helmets from that line. (*Id.*). The parties agree that royalties are payable on the sale of any Vector helmets, and that CCM has paid HIT royalties for the sale of those helmets under the terms of the Agreement. (Def. Mot. Summ. J. SMF ¶ 6).

### b. Helmets in Dispute

The dispute in this case centers on helmets developed after the Vector line: the Resistance line, the HT11K helmet, and the FitLite line. (*Id.* ¶ 7).

Phillippe Martin was also the lead designer on the Resistance line of helmets. (Martin Aff. ¶ 2). The development of that line began around 2010 and was completed in late 2013. (Gibson Aff. ¶ 2). One of CCM's express objectives in developing the Resistance line was to avoid paying HIT royalties on helmet sales. (Gibson Dep. 185–86). Martin testified that although there are some elements in common between the Resistance design and the Hefter Shell Design, including the placement of ventilation holes, those elements were not inspired by the Hefter Shell Design. (Martin Dep. 219). According to Martin, "the outer shell design of the Resistance helmets was not derived from [the Hefter Shell Design] or the design of any other

3

then-existing hockey helmet. Put another way, neither [the Hefter Shell Design] nor the Vector shell designs were reused in the design of the Resistance outer shell." (Martin Aff. ¶ 3).

Another helmet designer employed by CCM, Sebastian Morin, was the lead designer on the HT11K helmet and the FitLite line of helmets, which includes the FL40, FL60, FL80, and FitLite 3DS models. (Morin Aff. ¶ 2). Like Martin, Morin contends that the designs of those helmets were not derived from the Hefter Shell Design or any Vector or Resistance helmet. (*Id.* ¶ 3). He further contends that the HT11K, the FL40, FL60, and FL80 were derived from the shells of a helmet line called the 8K helmet, which had a design completed before November 2005. (*Id.* ¶ 3). He further contends that he designed the FitLite 3DS helmet model based on feedback he received from NHL star Sidney Crosby as to his preferences in a helmet. (*Id.* ¶ 4).

### c. Ball Report

Roger M. Ball, HIT's expert witness, is a professor of industrial design at Georgia Tech University. (Docket No. 110, Ball Report Ex. B). He has more than thirty years of experience in industrial design, including as a designer and design consultant in the hockey industry. (*Id.*). He holds four United States patents on ice-hockey and snowboard helmets, and has authored articles on the design of protective headgear. (*Id.*).

In his expert report, Ball opined that the Hefter Shell Design has a "stealth fighter" look that "represents a significant departure from [CCM's] previous look of rounded, organic shapes." (Ball Report at 8). That look, he contends, has been maintained in the Resistance line, the HT11K, and the FitLite line. (*Id.* at 10). Ultimately, he concluded that although the helmets are "not identical," the Resistance line, the HT11K, and FitLite line of helmets are "derived from and are substantially similar to" the Hefter Shell Design. (*Id.* at 23–24).

### 3. Alleged Spoliation of Evidence

On September 22, 2014, HIT sent a letter to CCM demanding royalties for the sale of the Resistance line of helmets and informing CCM that it would take further action, including civil action, if not paid. (Pl. Mot for Sanctions Ex. L). The letter did not mention the HT11K or FitLite line. (*Id.*).

When threatened with litigation, CCM's policy is to issue a "litigation-hold memorandum" instructing employees not to destroy relevant information. (Wexelblatt Dep. 39–40). Keith Wexelblatt is in-house counsel at CCM. (Wexelblatt Aff. ¶ 1). Wexelblatt testified that the memorandum instructs the relevant document custodians not to destroy any information, to put all relevant information to the side, and to not delete any hard-copy or e-mail documents. (Wexelblatt Dep. 39). He also testified that he and other business leaders may issue verbal and written reminders concerning the memorandum as necessary. (*Id.* at 40).

After receiving HIT's letter, presumably in September or October 2014, Wexelblatt issued a litigation-hold memorandum to a number of employees involved in the development of the Resistance line. (Wexelblatt Aff. ¶ 4). The memorandum is not a part of the record in this case, as CCM has refused to produce the document based on a claim of privilege. Wexelblatt testified that he believed that the employees to whom the memorandum was issued complied with it by preserving the requested materials. (Wexelblatt Dep. 46–47). He testified that in order to ensure compliance, he spoke with some of the people to whom the memorandum was issued and with the information technology department, but could not remember with whom he spoke or what was said in those conversations. (*Id.* at 68–69). He did not take any other measures to ensure compliance with the memorandum. (*Id.* at 69).

CCM sent out an updated litigation-hold memorandum after the complaint and amended

complaint were filed in early September 2015. (Wexelblatt Dep. 63; Wexelblatt Aff. ¶ 5). Like the letter, those pleadings only asserted claims for royalties on helmets in the Resistance line. (Docket No. 1; Docket No. 8).

On August 2, 2016, eleven months after the original complaint was filed, HIT notified CCM that it intended to add a claim for royalties on the sale of the HT11K and FitLite line of helmets. (Davidson Aff. ¶ 6). On August 23, 2016, HIT filed an assented-to motion for leave to file a second amended complaint adding those models to its claims, which was granted the same day. (Docket No. 43–44). At some point thereafter, CCM again updated its litigation-hold memorandum to include the additional models. (Wexelblatt Dep. 63).

Connie Cadovius was the CCM employee responsible for assembling documents concerning HIT's claims. (Cadovius Dep. 14). She testified that she independently assembled documents "from the archives," and also asked document custodians for both electronically-stored information and hard-copy documents. (*Id.* at 20, 30). The employees to whom the litigation-hold memorandum was issued did not produce any hard-copy documents responsive to it because, she was told, no such documents existed. (*Id.* 30–31).

### a. Electronically-Stored Information

Around 2008, CCM changed the system employees used to send, receive, and store e-mail. (Wexelblatt Dep. 25). During the transition to the new e-mail system, stored e-mails that had been sent and received prior to the switch were destroyed. (*Id.*).

Also in 2008, CCM implemented an e-mail retention policy that allows employees to manage their e-mail storage. (*Id.* at 28). Under that policy, employees are permitted to store e-mails until their storage capacity runs out, after which they must delete messages to free up space. (*Id.*). CCM saves backup copies of e-mails for three months and then destroys them.

6

(*Id.*). The e-mails of employees who have left the company are also destroyed three months after their exit. (Wexelblatt Aff. ¶ 3). For all other documents stored on employees' computers, employees are free to determine which documents to retain and how long to retain them. (*Id.*).

Cadovius testified that at some point, she requested e-mail backups from the information technology department for two former employees who had not been identified as document custodians. (Cadovius Dep. 54–55). Those employees had left the company more than three months prior to CCM's receipt of HIT's September 22, 2014 letter. (Wexelblatt Aff. ¶ 8). Cadovius testified that a person in the department told her that "he had no email older than three months." (Cadovius Dep. 54–55).

Cadovius also testified that she went to the information technology department in 2016 to request e-mail backups for document custodians. (*Id.* at 59). She was told by an employee that, as to the document custodians she had identified, he "didn't have backup e-mails further than the policy required." (*Id.*). Cadovius did not know whether e-mails had been deleted. (*Id.* at 58).

According to Wexelblatt, after receiving the September 22, 2014 letter from HIT threatening litigation, he requested that CCM's information technology department take a "snapshot" of the e-mail mailboxes of the employees who had received the hold memoranda. (Wexelblatt Aff. ¶ 4). Those snapshots recorded a complete duplicate of the content of the subject's e-mail mailbox, including the inbox, sent mail, deleted mail, and folders. (*Id.*).

b. **Document Destruction**

Laura Gibson has worked at CCM since 2006. (Gibson Aff. ¶ 1). She is a Canadian resident and works at the CCM office in Montreal. (Gibson Dep. 18). She was the product manager for the Resistance line and many of the helmets in the FitLite line. (*Id.* at 23–24). She was one of the employees who received the litigation-hold memorandum following the receipt of

7

HIT's September 22, 2014 letter. (*Id*. at 44).

In her capacity as product manager, Gibson worked with salespeople, distributors, dealers, focus groups, and professional athletes to gather feedback on helmets. (*Id.* at 24). She kept notebooks in which, among other things, she recorded handwritten notes from some of those conversations. (*Id.* at 37). She describes the notebooks as "a running series of random notes regarding what [she] did, should do or might do." (Gibson Aff. ¶ 5).

During her time at CCM, Gibson has taken maternity leave twice; once from January 2013 to January 2014, and again from January 2015 to October 2015. (Gibson Dep. 19). In January 2013, at the time of her first maternity leave, she discarded all of her then-existing notebooks. (Gibson Aff. ¶ 6). She resumed taking notes in notebooks when she returned from that leave in January 2014. (*Id.*) She stated that it was her practice to throw notebooks away as she filled them. (Gibson Dep. 40). In addition, she cleaned out her desk at the start of her second maternity leave, and in the process discarded all of the notebooks that she had accumulated in 2014. (Gibson Aff. ¶ 6; Gibson Dep. 40). She did so even though she had received the litigation-hold memorandum only a few months previously. She testified that she discarded those notebooks because it "never occurred to [her] that anything [she] kept in [them] would be relevant to the claims for royalties that HIT has made." (Gibson Aff. ¶ 5).

In addition to those handwritten notes, Gibson stored briefs and other documents concerning the direction of helmet lines on her laptop. (Gibson Dep. 38). After she received the litigation-hold memorandum, she provided Wexelblatt with documents responsive to it, including e-mails. (Wexelblatt Dep. 56–58; Gibson Aff. ¶ 4). Gibson alone reviewed information on her laptop; no one from the legal department conducted an independent review to ensure that all responsive documents were produced. (Wexelblatt Dep. 57–58).

Each time Gibson took maternity leave, CCM wiped her laptop clean. (Wexelblatt Aff. ¶ 6). According to CCM, under Canadian law, when a woman takes maternity leave she technically ceases her employment with the company and becomes employed by the government. (*Id.*). It is CCM's practice to destroy the files of all exiting employees, including those who take maternity leave. (*Id.*). Therefore, at the time the litigation-hold memorandum was issued, Gibson's laptop contained no information older than January 2014, because information from earlier in her tenure had been previously wiped clean. She testified that information she might have had on her laptop in 2014 would not have included any documents concerning the design or development of the Resistance helmet, because that was completed in 2013, prior to her first maternity leave. (Gibson Dep. 202). She did not foreclose the possibility that her laptop may have contained some information concerning the Resistance helmet; instead, she stated that she "might have had some stuff" but could not recall any specifics. (*Id.*).

c. **Supplemental Document Production**

In April 2016, counsel for HIT notified CCM that he was concerned that only a small number of documents had been produced in response to HIT's discovery requests. (Pl. Mot. Sanctions Ex. P). Counsel for CCM responded that HIT had received all of the documents that CCM had agreed to produce. (*Id.*).

In September 2016, HIT took the deposition of Laura Gibson. (Gibson Dep.). Both Wexelblatt and outside counsel for CCM, Shepard Davidson, learned for the first time at that deposition that Gibson had discarded her notebooks prior to leaving for maternity leave in January 2015. (Wexelblatt Aff. ¶ 7; Davidson Aff. ¶ 7).

Gibson also testified at her deposition that she had forwarded potentially relevant e-mails and documents to other CCM employees in the marketing department. (Davidson Aff. ¶ 8). In

9

response to that testimony, Davidson instructed CCM to expand the search for e-mails to employees in the marketing department. (*Id.*). Also in response to that testimony, Davidson instructed CCM to have Gibson and other employees review the e-mail mailbox snapshots that had been taken in the fall of 2014 to ensure that they had not missed any e-mails that were responsive to CCM's requests. (*Id.* ¶ 9).

As of the fall of 2016, the operative scheduling order in this case set a deadline for the close of fact discovery on November 29, 2016. (Docket No. 67). About one month prior to that deadline, on October 26, 2016, CCM made a supplemental production of a significant number of documents. On December 15, 2016, CCM produced some additional e-mails. (Pl. Mot. for Sanctions at 4).[2] CCM contends that it made those supplemental productions after expanding its search for documents in response to deposition testimony by Gibson (and others).

### B.    **Procedural Background**

On September 3, 2015, HIT filed the complaint in this action, which it amended on September 14. A second amended complaint was filed on August 23, 2016. The second amended complaint alleges five counts for breach of contract, breach of the duty of good faith and fair dealing, unjust enrichment, and seeks a declaratory judgment that it is owed royalties on the Resistance line, HT11K, and FitLite line helmets, and an accounting of unpaid royalties.

HIT has filed a motion for sanctions for spoliation of evidence alleging that CCM destroyed relevant documents.

## II.    **Analysis**

The scope of the documents at issue in this motion is relatively narrow. HIT contends

---

[2] The parties have not provided the Court with sworn testimony concerning the number of documents produced in the supplemental production, but they appear to agree that the October production consisted of a substantial number of documents while the December production was more modest.

10

that CCM destroyed documents in three categories: e-mails lost due to routine management of electronically-stored information; electronic documents stored on Gibson's laptop when it was wiped in December 2014; and Gibson's hard-copy notebooks.

### A. Electronically-Stored Information

The issuance of sanctions for loss of electronically-stored information is governed by Fed. R. Civ. P. 37(e). The present version of Rule 37(e), effective as of December 1, 2015, provides as follows:

> If electronically stored information that should have been preserved in the anticipation or conduct of litigation is lost because a party failed to take reasonable steps to preserve it, and it cannot be restored or replaced through additional discovery, the court:
>
> (1) upon finding prejudice to another party from loss of the information, may order measures no greater than necessary to cure the prejudice; or
>
> (2) only upon finding that the party acted with the intent to deprive another party of the information's use in the litigation may:
>
>> (A) presume that the lost information was unfavorable to the party;
>>
>> (B) instruct the jury that it may or must presume the information was unfavorable to the party; or
>>
>> (C) dismiss the action or enter a default judgment.

Fed. R. Civ. P. 37(e) (effective Dec. 1, 2015). The Advisory Committee Notes to the 2015 amendment to Rule 37(e) provide that the Court has "discretion to determine how best to assess prejudice in [a] particular case." Fed. R. Civ. P. 37(e) Advisory Committee Notes (2015 amendment).

The prior version of the rule, in effect at the time that this litigation was filed, provided that "[a]bsent exceptional circumstances, a court may not impose sanctions under these rules on a party for failing to provide electronically stored information lost as a result of the routine, good faith operation of an electric information system." Fed. R. Civ. P. 37(e) (effective until Nov. 30,

2015).[3]

In amending the Federal Rules of Civil Procedure in 2015, the Supreme Court provided courts with some discretion to choose which version of a rule to apply in cases that were pending at the time the change became effective. *See* 2015 U.S. ORDER 0017 (C.O. 0017) ("[T]he foregoing amendments to the Federal Rules of Civil Procedure shall take effect on December 1, 2015, and shall govern in all proceedings in civil cases thereafter commenced and, insofar as just and practicable, all proceedings then pending."). This case was brought in September 2015, only three months prior to the effective date of the amended rules. CCM did not file an answer until December 21, 2015. In light of the close proximity in time of the filing of the complaint and the effective date of the amendment, it appears both just and practicable to apply the amended Rule 37 to this case.

First, HIT contends that sanctions are warranted due to CCM's failure to suspend its policy of deleting e-mail backups every three months. However, HIT has not shown that any relevant e-mails were in fact destroyed. HIT points to the deposition testimony of Connie Cadovius as support for its claim; but although she stated that she had been told that there were no backups of e-mail older than three months, she also stated that she did not know whether e-mails had been deleted. According to CCM's in-house counsel Wexelblatt, all employees who were identified as document custodians had a snapshot taken of their e-mail mailboxes around

---

[3] Courts interpreted the earlier version of Rule 37(e) to permit the imposition of sanctions only upon a finding that a party acted with a "culpable state of mind" in failing to preserve evidence, which included negligence and gross negligence. *See, e.g., Residential Funding Corp. v. Degeorge Fin. Corp.*, 306 F.3d 99, 113 (2d Cir. 2002). The current version of Rule 37(e)(2) provides for the possibility of severe sanctions where a court finds that a party acted with intent to destroy evidence, but rejects the imposition of sanctions under that provision where a party is found to be negligent or grossly negligent. *See* Fed. R. Civ. P. 37(e) Advisory Committee Notes (2015 amendments) (stating that the amended Rule 37(e)(2) "rejects cases such as *Residential Funding Corp. v. DeGeorge Financial Corp.*, 306 F.3d 99 (2d Cir. 2002), that authorize the giving of adverse-inference instructions on a finding of negligence or gross negligence."). Where electronically-stored information is lost due to the negligence or gross negligence of a party, amended Rule 37(e)(1) permits only the imposition of sanctions that are "no greater than necessary to cure the prejudice."

the time that CCM received the September 22, 2014 letter from HIT threatening litigation. That contention is supported by the fact that CCM made a supplemental production of e-mails that apparently had been overlooked in 2014, but located when the e-mail snapshots were reviewed in 2016. While the record supports a conclusion that CCM's response to the document production request was very far from ideal, it does not support a finding that any relevant e-mails were actually destroyed.

Next, HIT contends that CCM should be sanctioned for failing to preserve information on Gibson's laptop. First, it appears that relevant evidence on Gibson's laptop was produced to CCM and preserved prior to being wiped. There is no basis for sanctions where information that was destroyed in one form is available in another form. *See Alexce v. Shinseki*, 447 F. App'x 175, 178 (Fed. Cir. 2011) ("The routine destruction of duplicative documents does not present the risk of denying an adversary access to relevant information, which is what the doctrine of spoliation is directed to."). According to both Wexelblatt and Gibson, Gibson reviewed the information on her laptop prior to taking leave, located responsive documents, and provided them to Wexelblatt.

That does not, however, end the inquiry. In light of the fact that CCM employees found e-mails they had previously missed when they were asked to review the e-mail snapshots in 2016—and Wexelblatt's testimony that no one verified that Gibson produced all responsive documents prior to her leave—it is possible that CCM's review of information on Gibson's laptop was less than exhaustive. However, even if the Court assumed that CCM's cursory approach to document production resulted in Gibson's laptop being wiped prior to a thorough review, sanctions are inappropriate because there is insufficient evidence from which to find that CCM acted with the requisite intent, or that HIT will suffer prejudice.

First, there is no evidence that CCM wiped Gibson's laptop with the intent to deprive HIT of evidence. CCM had a policy to wipe information from the laptops of employees taking maternity leave. It had wiped Gibson's laptop when she took her first maternity leave. The evidence in the record does not support a finding that CCM acted in bad faith by wiping her laptop at the start of her second maternity leave in December 2014.

Second, there is insufficient evidence from which to infer that HIT would suffer prejudice if CCM's review of the information on Gibson's laptop was less than perfect. Again, when CCM wiped Gibson's laptop in December 2014, the laptop contained only information from the period between her maternity leaves: January 2014 to December 2014. At that time, CCM was under an obligation to preserve only information concerning the Resistance line of helmets. Gibson testified that the design of the Resistance line was completed in 2013 and that in December 2015, her laptop would not have contained anything concerning the development or design of the Resistance line. She did testify that she "might have had some stuff" concerning the Resistance line, but could not identify what documents she had, if any. Insofar as the Court infers that CCM missed some relevant documents on the margin prior to wiping Gibson's laptop, there is little evidence to support a finding that HIT was prejudiced as a result.[4]

Accordingly, based on the record before the Court, no sanctions are appropriate against CCM for failure to preserve electronically-stored information pursuant to Rule 37(e).

**B.     Notebooks**

The standard for finding spoliation of physical evidence, including the notebooks at issue here, is somewhat different from that articulated under Rule 37. Under the relevant standard,

---

[4] The potential prejudice, if any, of the lost materials is necessarily framed by the nature of the proceeding. This is an action for breach of contract. The design of the helmets at issue is not a secret; whether the design was "derived from" the HIT design can be determined largely from a visual inspection.

14

spoliation requires: "(1) an act of destruction; (2) discoverability of the evidence; (3) intent to destroy the evidence; and (4) occurrence of the act after commencement of litigation or, if before, at a time when the party was on notice that the evidence might be relevant to potential litigation." *Gordon v. DreamWorks Animation SKG, Inc.,* 935 F. Supp. 2d 306, 313 (D. Mass. 2013).

Courts have inherent power to impose sanctions on parties that have spoliated evidence. *Chambers v. NASCO, Inc.,* 501 U.S. 32, 43–45 (1991). In determining what sanctions to apply upon a finding of spoliation, courts consider, among other things, whether a party acted in good faith or bad faith, and whether prejudice resulted from the destruction of evidence. *Townsend v. Am. Insulated Panel Co.*, 174 F.R.D. 1, 4 (D. Mass. 1997) (quoting *Mayes v. Black & Decker (U.S.), Inc.*, 931 F. Supp. 80, 83 (D.N.H. 1996)); *see also Collazo-Santiago v. Toyota Motor Corp.*, 149 F.3d 23, 29 (1st Cir. 1998) ("[O]f particular importance when considering the appropriateness of sanctions is the prejudice to the non-offending party and the degree of fault of the offending party"). In general, an adverse inference based on spoliation "usually makes sense only where the evidence permits a finding of bad faith destruction; ordinarily, *negligent* destruction would not support the logical inference that the evidence was favorable to the defendant." *United States v. Laurent,* 607 F.3d 895, 902 (1st Cir. 2010) (emphasis in original). However, "mere negligence in the destruction of evidence" can sometimes be "sufficient to merit sanctions." *Citizens for Consume v. Abbott Laboratories,* 2007 WL 7293758, at *7 (D. Mass. Mar. 26, 2007).

It is undisputed that Gibson destroyed her notebooks. It is also undisputed that she did so, at least in part, after CCM received HIT's September 22, 2014 letter and Gibson received the litigation-hold memorandum, placing her under an obligation to preserve all documents related

15

to the Resistance line. According to her sworn affidavit, she threw notebooks away at the beginning of her second maternity leave because it "never occurred to [her] that anything [she] kept in [them] would be relevant to the claims for royalties that HIT has made." She also testified at her deposition that it was her practice to discard notebooks as she filled them and that she discarded notebooks at the beginning of her first maternity leave as well as her second leave. From that evidence, it is fair to infer that Gibson did not act with intent to deprive HIT of the notebooks by discarding them. Instead, her actions appear to be negligent, at worst.

It is far from clear that HIT suffered any prejudice due to the destruction of Gibson's notebooks. At the time they were discarded, Gibson was obligated to preserve only information concerning Resistance helmets. Like the information on her laptop, she had only notebooks from the 2014 calendar year, at which point the design and development of the Resistance line had been completed. Therefore, it is unlikely that the notebooks would have contained a substantial amount of information that was highly probative of CCM's liability.

### C. Conclusion

In light of the weak showing of prejudice and Gibson's lack of intent to deprive HIT of evidence, severe sanctions against CCM are not warranted. It appears that no probative electronically-stored information was destroyed. Some evidence may have been destroyed when the notebooks were discarded, but HIT will not suffer substantial prejudice as a result. Nonetheless, the combination of CCM's failure to preserve the notebooks, its somewhat lackadaisical approach to document production, and its aggressive document destruction policies has created substantial issues in this case. At a minimum, it has complicated the discovery process. Hefter's decision to bring this motion, although not ultimately successful, was an entirely reasonable response under the circumstances.

Accordingly, the sanction that the Court will impose is that CCM will be required to pay the reasonable attorneys' fees and costs HIT incurred in bringing this motion. *See In re Ethicon, Inc. Pelvic Repair Sys. Prod. Liab. Litig.*, 299 F.R.D. 502, 526 (S.D.W. Va. 2014) (imposing sanction of reasonable costs of bringing motion for sanctions for spoliation where party negligently lost relevant evidence). HIT may file an application for the reasonable attorneys' fees and costs it incurred in bringing this motion for sanctions for spoliation, along with any supporting documentation, within two weeks of the date of this order.

### III. Conclusion

For the foregoing reasons, HIT's motion for sanctions for spoliation is GRANTED in part and DENIED in part. Specifically, the motion is granted to the extent that CCM shall pay to HIT the reasonable attorneys' fees and costs HIT incurred in bringing this motion for sanctions for spoliation. The motion is otherwise denied.

**So Ordered.**

Dated: August 3, 2017

/s/ F. Dennis Saylor
F. Dennis Saylor IV
United States District Judge